We will hear argument next in No. 14-1410, LSI Corporation v. International Trade Commission. Mr. Holohan? Yes, Your Honor. Please. Good morning, and may it please the Court. Just a minor housekeeping issue. I plan to talk about the 958 patent primarily, and my partner, Mr. Supior, will address domestic industry with his time. If that's acceptable to the Three minutes. Go ahead. Thank you, Your Honor. Your Honor, in this case, the International Trade Commission committed with this Court is repeatedly referred to as a cardinal sin of claim construction by taking a fundamental claim term with a well-understood, plain and ordinary meaning and limiting it to the preferred embodiment and imposing a limitation in the specification. Not only that, they impose a limitation on the claim term that doesn't even exist in the specification. A code in the field of digital signal processing is a sequence of bits or chips. Can I just ask this? It seems to me that they had, the other side had two points, at least, which are of interest to me. One is that the system described by the patent requires that a single code be transmissible over either I or Q and doesn't have to be split. And they say it can't be done with a code representing a complex value. And the other thing that I think they say is the problem of having only N orthogonal codes with N length codes doesn't exist with complex codes. Can you address those two things? Yes, Your Honor. As to the first issue, there is a specific embodiment and a specification in which a single code is transmitted on either the I or the Q channel. And there are two lower data rate embodiments in which that is also the case. That is not a requirement in the claim and nowhere in the specification does the specification speak to any particular advantages or innovations related to transmitting a single code. Can I ask this question? Do you agree or disagree with what I took to be an assertion of the other side that any time you have a code representing complex values, an individual code cannot be transmitted over a single, I don't know if the word channel is right. We're talking about the I channel and the Q channel. I know that there's testimony that that's the way it works with the CCK, particular complex coding. Is that inherent in a code that represents complex values? I don't believe it is, Your Honor, because I hesitate with the term complex code. I didn't use the term complex code. I understand, but I just want to make sure I'm using the nomenclature correctly. So we're I see your question, Your Honor. Now, a sequence of chips that represents a complex value is simply a sequence of pairs of bits, each one representing a complex number. That single stream of bits can be transmitted along a single channel. Now, there are certain implementations where you can say I have the I channel and the Q channel. They each represent different values. And if I put those together, that's a complex value. But at the end of the day, you are still left with ones and zeros representing just simply sequences of chips being transmitted. Was there testimony, including written testimony, that said that a code representing a complex value or complex values can, in fact, be transmitted over a single channel? Yes, Your Honor. I believe Dr. Negus said that. Where is that? I don't have the record set in front of me, but I can look it up. Dr. Negus consistently testified that this real value, complex value distinction has no meaning in the field of digital signal modulation. Now, I know that they're going to come up here and talk about this particular paper by Dr. Negus where he talks about complex codes. And that is the only time the phrase complex code appears in any technical documentation in this case. And it just shows there's a matter of mathematical notation and really abstraction to consider pairs of chips or codes themselves to represent complex as opposed to real value. Can you address the other thing that I asked about, the idea that in a system in which each code is of length n, there can be only n orthogonal codes, and the assertion that that is not true if the code represents complex values? Yes, Your Honor. First of all, I'm not sure that that is true. Dr. Teagard said that several times. He never really showed his work on that. Assuming that it is true, that particular alleged problem in the prior art is not what this patent is about. This patent is about data rates. It is about an extended code set based on complementary values with auto-correlation side lobes suitable for multipath. Now, there may have been particular problems with square code sets that only involve real numbers that might not have existed with complex values, but that is not in the record. The commission and interveners have said, well, there were complex value code sets in the prior art where this wasn't a problem. My question is, where? Where in the prior art are these modulation systems with extended complex code sets that had suitable auto-correlation side lobes? The only reference they pointed to that allegedly has that is the Brassad reference, which, as we've shown in our briefs, does not disclose the extended code set. But even beyond the question of whether that problem exists or not, the problem and the What defines the claim is the words in the claim. That is the meets and bounds of the patent rights. And intervener's products fall squarely within the meets and bounds of every asserted claim in this case. When code is properly construed as a sequence of chips, which is how it is understood in the field of digital processing, intervener's products use code. And they use so-called codes representing real values as well, as we've shown in our I think, well, I could see, is the time I'm looking at is seven minutes? That's your honor. Okay. So why is it that you think that in the 182, the matrix, the four by, or eight by four Your honor, we explained that in our brief. And there is a misstatement in some of the briefs here that we just simply pointed to matrix A and said, this is a, an extended code set. It's a matrix used by multiplication to create certain. It's a matrix used through various phases. And as the patent specification describes in the context surrounding the matrix and elsewhere, you have, you have eight phases that are used to modulate carrier waves. The eight phases are based on, on four input phases, which are related to input data. So you have your grouping of bits to generate the phases. The phases are multiplied by matrix A to produce a complementary code. The output phases are phi one through phi eight. Those are your chips. Then you have, there are 12 data bits in each group. Two to the power of 12 gives you, gives you over 4,000 possible codes. Possible, but that's not, I mean, you always have two to the whatever, two to the end of the possibility. So the question is how many actual codes are being specified as used? There are four, there are over 4,000 possible codes. These are eight, eight chip long codes? Eight chips and over 4,000 possible codes. Right, but so how many are being used? Any number within the 4,000 could be used. And the specification reasonably conveys, one of skill, one of skill in the art, that that's, that that is how the code is taken. So all, was it two to the eighth, is that what it is? Two to the eighth possibilities could be used without any of the autocorrelation or cross-correlation problems? That can't be right. The cross-correlation side lobes are addressed elsewhere on the pad using a specific complementary code equation that appears in the 802.11 standard. So once that equation is involved, then the autocorrelation side lobes fall out of that. And that's what Dr. Cotty tested. Thank you, Your Honor. Thank you. Domestic industry. Yes, Your Honor. No product covered by the patent anywhere in this record. Right, and the standard. Why is that not a decisive problem? Because the standard applied at the time of the hearing, the standard that was, the parties had before them was a standard that did not require that for 20 years. Aside from everything else, InterDigital, the rehearing portion of InterDigital came not only before the hearing, but before discovery closed, right? InterDigital didn't change the law. InterDigital had dicta that suggested a potentially different approach. But defining both InterDigital 1, which is actual holding, was that in that case, InterDigital did not. So you thought in preparing for the hearing that when a court wrote this long opinion that said there actually has to be a product covered by the patent and it's that product, a patent-covered product, to which even licensing must relate, that you didn't have to go to the hearing on the assumption that you just might have to meet that standard? No one at the time read it that way. There are three parallel proceedings in the IPC, all of which came after the InterDigital decision, all of which did the exact same thing. No one understood the law to have changed. The 837, the 851, the 849 investigations in the ITC all took place after the InterDigital decision. All of them applied the same standard that we applied here. It wasn't until the ITC changed the law in January 2014. If you look at the InterDigital decision, and I'm sure you're familiar with it, that decision did not have any showing of actual use of the article in commerce. There was an affirmance of the underlying decision. The panel was two-on-one split. Judge Mayer was in that panel. And the conclusion, and Judge, by the way, in that decision, the original decision, Judge Newman did not dissent with respect to that issue. She was on board. All three judges said there was a finding of domestic industry affirmed without any showing under A3C, without any showing of use of the article in commerce. That was the holding in that case that filled the law today with respect to A3C. In the rehearing request, which was the subsequent decision, InterDigital 2, there was a rehearing request denied and there was an en banc request denied. The judges took up, three judges, the original panel, took up the issue on the en banc, or the rehearing question. It's got to be dicta because at that point decisions were already made. They affirmed again. Again, this was two-to-one also. Judge Bryson again affirmed that there was a finding of domestic industry, and the record hadn't changed. There had been no showing of use of the article under A3C. The standard had not changed. Now, I'll acknowledge that there's discussion in there that suggests a change. Right. I mean, it's one thing to argue about whether it was dicta or binding, but you're making a specific argument that you should be excused for lack of any evidence of this point at the hearing, an argument that has to rest on some notion of no notice that you even reasonably might be held to need such evidence. That's quite another thing. That is exactly the situation. There were three different ITC proceedings investigations at the same time that came to the same conclusion. Our judge actually looked at InterDigital 1, footnote 66, RALJ, and said, this confirms what we say. All you need to show is the licensing aspect of it. The technical prong doesn't apply. That's what everyone understood, and that's what everyone applied in this particular case. But how could that possibly have been the case, that understanding incorrect after InterDigital 2? Whether it's dicta or not, it's very specific about a technical requirement. I mean, I have it before me. It looks like we made explicit what the rules should be. The holding of the case. You know, I'm not really interested in quibbling about what the holding is and what dicta is. It seems to me that if we say something and apply a test, that it at least puts you on notice that we think that's the right test. Whether it's actually necessary to the holding in that case is really irrelevant, isn't it? Well, the language in InterDigital 2, which is the one you're pointing to, goes different directions. There's some language that supports what you say, but if you look at the actual last lines here, it's on 1303, going to 1304, that decision. Here's where all this leaves us. Under the clear intent of Congress and the most natural reading of the 1988 amendment, Section 337 makes relief available to a party that has substantial investment in exploitation of a patent through either engineering, research and development, or licensing. It is not necessary that the party manufacture the product that is protected by the patent, and it is not necessary that any other domestic party manufacture the protected article. As long as the patent covers the article that is the subject of the exclusion proceeding, and as long as the party seeking relief can show that it has sufficiently substantial investment in exploitation. I mean, the as long as, the first as long as phrase, coupled with the explanation of that in the first two pages of the opinion that says the licensing has to relate to a product that actually is covered by the patent. Which could be interpreted to mean you have to show there's infringement. You have to show that the thing, and there's actual language in there. Right, but isn't that what's missing here? Well, our position is there was infringement. We've made a case for infringement. That's what we're arguing about. Mr. Holohan's argument was that under the proper claim construction, there was infringement and there's coverage. If there's no infringement, we have nothing else to talk about. But under this decision, if there's a showing of infringement, Did you make the argument in your brief that the domestic industry ground depends on finding infringement by the accused products, not by something you've licensed? No, we made the argument the law didn't change, and the law hasn't changed. Can I ask you about the 867? Certainly, yes sir. I know that you're over your time. Since there plainly is no preclusive effect of the ALJ ruling on the 867, indeed there wouldn't be a preclusive effect of the ITC ruling, what concrete harm are you seeking to avoid by what you request us to do, which is to order the ITC to vacate the ALJ ruling? First of all, we think you can vacate it from here without ordering them, but the idea is this. We agree with what you just said, that there is actually no binding effect on this. But the decision is still out there. The negative importation of that is still out there, that a court or an ALJ has made negative findings with respect to infringement. Well, I know, but we don't reverse things because they make you unhappy to read the question is what is the concrete effect of that decision being out there? That it can be submitted as evidence in another proceeding? Sometimes decisions can be. It can be, it can be used. It's just like the Tessera case where this court vacated. It's the same situation where there's a decision that's not necessarily the finding, but the decision is still out there. And because of, in Providence, misfortune, an extension here in this case by the Commission multiple times to push the hearing date back several times. In the federal court context, for 60 years since Munsingware, if this was decided by the Supreme Court, mootness of a case while on appeal typically produces a vacator of the lower court decision. But in the judicial system, district court decisions, even while they're on appeal, do have preclusive effects. So the vacator is actually necessary to get rid of a preclusive effect. That would not seem to apply here. So the question is, why is it that the ITC acted improperly? I don't know if it's arbitrary and capricious or what exactly the right doctrine is, or the doctrine as you're invoking, in saying we don't need to do anything about the ALJ initial determination. The issue is simply this. The decision is out there to be used in other matters and cited against us. The ITC made the determination to take all issues into consideration. What harm can it have if it's cited against you if it doesn't have any kind of preclusive effect? I mean, your response is going to be the ITC has said it has no effect. And we agree. You're right. Legally there is no effect. That's absolutely true. And from that perspective, there is no harm, and we agree with that. But just as in the Tessera case, where the ITC in that situation had an opportunity, where they took a case, they took all the issues, and then they decided not to and left an adverse decision sitting, there was no reason why when they did that they could have just said, we'll vacate that because it wasn't your fault. It wasn't our fault that these extensions took place. But you're right. There is no legal impact. What the impact is, in terms of any licensing negotiations or others, this will be out there and cited against us. And under the circumstances, under the Tessera case, if they could have, and you can, vacate that decision, and we're asking you to do that. Okay. We've kept you for well over your time. We'll give you two minutes for your rebuttal. Thank you, sir. Ms. Chen. Good morning. May it please the Court. I'd like to first address the panel's questions to LSI's counsel before briefly addressing some inaccuracies in LSI's reply brief. Can I ask you, though, does the domestic industry ground for rejecting a violation here stand independent of anything we may think about the infringement ruling? I believe it does. The non-infringement ruling. I believe it does, Your Honor. There are many grounds that the panel can affirm the Commission's finding of no violation in domestic industry as one of those grounds. Why would it not be the case that if the Commission was wrong about non-infringement and that got remanded so there was a possibility of infringement, why would that finding of infringement not suffice for the domestic industry requirement? Because the LSI is not challenging the ALJ's finding, which the Commission adopted, that the articles that were presented, the evidence regarding the licensed articles that were presented before the ALJ, are not the articles that practice the 958 patent. That finding is not challenged on appeal. Can accused articles ever constitute the required patented articles for the domestic industry or not? I believe they have to be different articles, Your Honor. Have we said that or the Commission said that? I believe it was the Commission's opinion, Your Honor. You understand why this is of interest to me. The domestic industry issue here is, to put it mildly, rather simpler than the claim construction and infringement issues, and I'm trying to understand if the two are in fact inextricably linked. Right. I can't think off the top of my head the opinion's name, but if accused articles could be the articles that infringe the protected patent as required by Section 337, that requirement would have no meaning otherwise because there's always accused products in a Section 337 investigation. If that were the case, then proving infringement of an accused product would automatically prove articles are infringed on the patent, and that just cannot be the case. If you want to go back to... Can you address the two issues that I raised about the claim construction, and one having to do with whether including codes that represent complex values would address a problem that does not exist, and that was a point of the patent, and second, whether it is in fact possible to have a code representing complex values that can be transmitted on a single channel. I'd like to address the second point first. Please. The Commission adopted the ALJ's findings that a code representing a complex value cannot be transmitted using a single channel, and that was because LSI's own expert testified, quote, Dr. Cotty explained that a complex code is analogous to the I and Q branches of a modulator, and this is at JA12983. So he's explaining that the real part, the real component of a complex code is transmitted on the I channel. This is what I'm troubled by, and I'll state it maybe more devil's advocate-y than might be appropriate. I'm not sure why any of that testimony makes any sense, and until I can figure out why it makes sense, I'm nervous about whether there's something funny about the wording of the testimony. I understand that there was testimony about how in the CCK coding, a single code representing complex values does in fact travel over two different channels, I and Q. What I don't understand, and I'd love it if you can make me understand one way or the other, I guess for your purpose only one way, is that that is necessarily the case, which I truly do not understand. That is not something that you can read straight from the 958 patent, and so the ALJ relied on expert testimony for that finding. And the inventor himself, the sole inventor of the 958 patent, Dr. Vanni, testified that it's one of the crucial, the central difference between real codes and complex codes is how it's transmitted. Let's not use the term real code and complex code. Codes representing real value and code representing a complex value. Why is a code representing a complex value? Basically, to simplify, just twice as long or using, right, twice as long, and you can have an eight, a length eight code representing a complex value, representing four complex numbers, and you can send that eight length code over a single channel. The reason is the eight length code is not simply a series of single binary bits. The eight length code is actually die bits, which is what the standard is called. They're pairs of bits. And so the pairs of bits are... Take my hypothesis. An eight length code representing four complex numbers. Call that four die bits or eight bits. I don't care. Same thing. Right. The imaginary part would be split from the real component, and the imaginary component would be transmitted on a Q channel. Would be. What does would be mean? Why does it have to be? That's because the whole point of the difference between a complex code and a digital modulation system is that the real and imaginary parts are simultaneously occupying both channels, the I and Q. And by doing that, it has the benefit over real codes, where you have independent codes traveling on the I and Q. The benefit is that you actually have minimized cross-rail interference. What I mean by that is when you have the imaginary part and the real part simultaneously occupying two channels, sending a single code down the system, that has no interference versus a system that implements only real codes. You have two independent codes, and those can be orthogonal codes that might actually interfere with each other on those two channels. This is one of the crucial differences why the CCK modulation implements complex codes instead of using independent real codes. Dr. Vanni himself testified that the 95A patent, that complex codes cannot be independently modulated on the I and Q channels. In fact, there's no expert testimony that a complex code can be transmitted using a single channel. And in fact, one of the reasons that the 95A patent must be limited to real codes, as your other point was, the stated purpose and the stated problem does not apply to complex codes. It is undisputed expert testimony from all of the parties that the AOJ has relied on that if the N are digits, then you have more than N orthogonal codes. Tell me why that's not just a semantic point. And the real question is, N di-bits is 2N bits. Do you have 2N? Are you limited to 2N orthogonal codes? You would be limited to 2N orthogonal codes if you were talking about real codes. But in a complex code, you have the imaginary component. That's how you get to 2N. But you have 2N plus, you have 2N because of the real part. And now you have another 2N because of the complex part. Because of the imaginary component. Because you have actually two sets. You have the real component and you have the imaginary component. And this is why complex codes always meet the limitation M is greater than N. Because you have an imaginary component that increases the number of possible codes, which you do not find with simply a real code. That only has one part. I don't think it's going to get any better for me. But the important point is, it's undisputed. LSI's expert and intervenors' experts both testified that the stated purpose of the 958 patent does not apply to complex codes. And this is at JA21795-97 for LSI's expert testimony. What was that page again, please? It was JA21795-97 for Dr. Cotty's testimony and JA15811-812 for Dr. Hegar's testimony. Right. It was that testimony that I was not sure how to process. So LSI's counsel shies away from using the terms complex code and complex chips. And that's because, yet in its own claim charts and in its briefing before the AOJ, those terms were used throughout by both parties. The understanding was, during claim construction, the dispute was whether to limit the asserted claims to only real codes or whether it could be broadened to include complex codes. The panel also asked questions regarding Matrix A and autocorrelation side lobes suitable for multi-path environments. If I can quickly address that. Matrix A is not a code set as disclosed in the 182 patent. What does the 182 show about the code sets produced by the use of Matrix A when multiplying it against certain vectors? The 182 patent specification at JA11739 at column 4, lines 37 to 61, specifically teaches that Matrix A is used by the receiver and not the transmitter, which has the modulator. And that Matrix A is used to determine the value of the encoded phases for measured phases. If anything, LSI's counsel cannot point to what Matrix A, what M is, and what N is. In fact, the 182 patent specification explicitly provides that N equals 8 because at JA11738, column 1, lines 35 to 37, and lines 60 to 62, it defines N as a length 8 code, which means N equals 8. And looking at Matrix A, if N equals 8, then one would see that M equals 4. And it actually discloses that M is less than N. With respect to priority, the commission found that the autocorrelation side lobes suitable for multi-path environments was not disclosed in the 182 patent because LSI's expert relies exclusively on teachings from 802.11b standard. Those teachings are nowhere found in the 182 patent. And in fact, LSI's own expert testified that use of the equation, the cover sequence, in the 182 patent has to be used in a particular context, specifically in the context of CCK modulation, and also has to be combined with things such as the Hadamard encoding matrix in order to achieve good autocorrelation side lobes suitable for multi-path environments. Neither CCK modulation or any of these other things, Hadamard encoding matrices, are actually found in the 182 patent or disclosed there. So simply disclosing an equation and a cover sequence in the 182 patent that you can also find in the standard, it's simply not as sufficient for a written description requirement. And the M greater than N requirement is the sole one of the four that cuts across all claims, right? That's right, Your Honor. If I can briefly address domestic industry. First, what InterDigital says is not on appeal. LSI in its own opening brief did not challenge the Commission's interpretation of InterDigital. In fact, in a different investigation, LSI successively argued before the Commission that InterDigital requires articles for subparagraph C. I mean, their argument is this was a surprise. Even taking aside that InterDigital decided before the evidentiary hearing and before the close of that discovery, which LSI's counsel could have requested for additional extension of time for discovery if it needed, it didn't do so. But even if it could not have been a surprise after the Commission's notice of a review, because in that notice of review, the Commission explicitly signaled to the parties that it was considering applying InterDigital in the article's requirement. And even then, in response to the Commission's questions in its notice of review, LSI did not request for a remand or that discovery be reopened. In fact, its response in its submissions to the Commission was that there is ample evidence of record to support the article's requirement. But other than identifying the same licensed articles that the Commission already found did not practice the 958 patent, the only other evidence that LSI presented, and that's the only evidence that LSI presents in its opening brief, is a presentation. I believe it's a PowerPoint presentation that's made to a potential licensee. There's no evidence in the record that the potential licensee ever licensed a 958 patent. There's also no record in the evidence that that potential licensee article has actually practiced a 958 patent pursuant to the AO211B standard, which is LSI's theory regarding articles. You've gone, I think, well over your time. Unless there are more questions, why don't we hear from your colleagues? Mr. Bright, do you have some subset of the issues that you're going to talk about or are you open for anything? I am open to anything, Your Honor. Why don't you start with whatever you want to talk about. But I will try to avoid redundancy, Your Honor, in the interest of time. I want to address the questions that you've had thus far. First, I take issue with LSI, the appellant's position that there is record evidence that the real and imaginary parts of a complex code can be transmitted on a single channel. I'm not aware of any such evidence. I don't believe it exists. I will point out... Can you take one shot at trying to get through my thick skull why that's not possible? I will take my best shot. And I don't mean why it's not done in the CCCA implementation of the Wi-Fi system. I understand. The answer is that if you think this is a pair of chips, real and imaginary part, they are a pair. They go together. So for decoding purposes, at the decoder, they have to receive them in parallel and understand the relationship between the chips at that time of decoding. Therefore, if you work your way back to the modulator, to the transmitter, they have to be transmitted in parallel. We've said, actually, in our intervener's brief, page 26, and we've cited to the record, that in contrast, two channels are required to transmit a complex code. One channel to carry the real part and the other channel to carry the imaginary part. To sort of answer, I think, Your Honor's question, why isn't there more in the record probably about this decoding aspect is because the claims are directed to the modulator side of things and they do not recite the decoder, the demodulator. But the implication of this testimony, the record site is fully supportive of what I've just represented to you, Your Honor, about the necessity of transmitting real and imaginary parts in parallel on separate channels. And this is consistent with two prior district court decisions that the 958 patent will only work with real codes, with only a real part. Two other judges reached that conclusion, reviewing the specification, all of the intrinsic evidence, that only real codes are disclosed and only real codes will work in the patent because a real code is transmitted on a single branch or the same version of that real code is transmitted on two branches in other embodiments in the specification. What about the other thing that I asked about, about why, if it's true, that the problem addressed by the patent of having only n orthogonal codes in n length codes doesn't exist for codes that represent complex value? We know, as was mentioned from previous questioning and answering, that even LSI's own expert admitted that this problem of m equals n, which is related to data rate as described by the patent, did not exist for complex codes. And it is because you have this additional dimension for complex codes. By adding an additional dimension of an imaginary part, you therefore increase the number of possible codes that you can obtain, because it's a function of the number of bits in the chip. So tell me why that's not what I just referred to at one point as a semantic issue with whether, instead of saying m greater than n, it should be m greater than 2n. This is a fundamental difference, Your Honor. No matter what the number m or n is, when you set it in the same context for both complex and real codes, you're still not going to have this problem that is described in the 958 patent that is unique to real codes. LSI's own expert said this m equals n problem is unique to real codes, not a problem with complex codes. You keep saying what's in the record, and that's important. I've asked all these questions because I'm trying to understand the point without just relying on somebody who says it in a way I don't understand. So if you have 2n length codes because each complex value requires two numbers, the real and the imaginary one, do you agree that there are only 2n orthogonal codes in that regime? Yes, possible. Yes, possible. So why do you not have the problem that that may not be enough for the purposes that they want to use, and so you're going to use more codes than orthogonal ones and live with some of the problems that might otherwise arise from using non-orthogonal codes by choosing them carefully enough so that the problems don't really arise, so that the dot products don't have side lobes and cross correlations and whatnot. But you can live with those even though they're not as good as orthogonal ones, but you get more. Your objective here, certainly as described in the patent, is to try to arrive at a code set with a certain data rate, and you are limited when you have real codes by the number of available codes, real codes, and you're trying to achieve this certain data rate. This is inextricably linked in the patent. The data rate you're trying to achieve, the fact that you're using real codes, which is actually a simplification in a sense because you can be, as described in the patent, transmitting over a single branch. The very context for the problem is one, that's why it's unique to real codes is because Dr. Van Nee, in setting forth this patent, was limiting himself to real codes and trying to address this problem of achieving the data rate he wanted with a limited number of available real codes to him and then trying to achieve the better data rate by increasing the number of codes with respect to a given length. Can I ask you the same question I asked Ms. Chan about the domestic industry point. Can the accused products count as products for domestic industry, and if not, as I assume your answer is not, why not? The answer is no. Because they're not domestic? Well, the answer is no, at least for the reason that that would render the domestic industry requirement superfluous, approving infringement to the ITC in a commission investigative proceeding. Because if all a complainant had to do was prove that the accused products, the accused articles were infringing, that would render what is an additional requirement for domestic industry, not subsumed with improving infringement in the ITC, superfluous. Your Honor. Go ahead. I'm sorry. Thank you. Please, go on. I would like to point out on the other issue that you have raised about the disclosure of the claims priority document,   that the claims priority document is a document that is subject to the I think from the questioning and the answer, you can see there's no explicit disclosure of a code set that would meet this M greater than N requirement expressed in the claims, the asserted claims, in this claimed priority document. Without that expressed disclosure, they're left with inherency. That's the only option they have. And they have no testimony that there is a code set with M greater than N necessarily present. We've been told there's 4,096 possible codes. We have no idea what the alleged code set is satisfying this property, M greater than N, also the other properties you're citing in the claims, what it is so that it can be evaluated. It's not there. Your Honor, I see Mike High. Do you, I forget, do you speak in your brief to the 867 issue or not? Yes. Yes, Your Honor. And I suppose I should have asked Ms. Chen this. Is the ALJ decision on the 867 the final decision of the commission? It's not a decision of the commission, Your Honor. Why is it not by regulation or other treatment? Although it has been, the ALJ decision has been reviewed in its entirety, it's not a commission opinion. It doesn't have precedential effect. It's up to other courts what weight, if any, to give it, what consideration to give it. There's no harm suffered here. Is it a question of when the ITC decided it would not vacate, it denied a motion to vacate, right, the ALJ decision. Denial of the motion to vacate is presumably a decision of the ITC. The ITC didn't really give a reason for doing that. Should it not have to give a reason about why the possible adverse evidentiary use in other proceedings should be eliminated at the front end by vacating a decision that became unreviewable in essentially the way Munsingware provides in the federal court system, though taking the preclusion aspect out of the equation. I think what is clear is that this denial of the motion to vacate is certainly within the discretion, the sound discretion of the commission. Agencies, when they exercise discretion, typically have to give reasons. The commission didn't, right? In this case, the commission did not, but this discretion is something that is explicitly committed to the commission's decision. And furthermore, I think what's very clear from the record that we have that what has come out of the commission and the ALJ's decision on 867 to district courts, article 3 judges, they're not bound by this. There's no possibility for mistake that they're bound by the outcome. No, but the ALJ decision could be used adversely to LSI in an evidentiary way, right? Aren't decisions that are not issue preclusive, let alone claim preclusive, often admitted into evidence in other proceedings? In other proceedings, Your Honor, that is committed to the discretion of article 3 judges in terms of what to admit. But in article 3 district court proceedings, there's going to be an opportunity for LSI to litigate these issues if that procedure plays out. And that's, I think it would, in that situation, the article 3 judge is going to look at these issues anew without thinking that it's bound by any of the fact-finding or the legal determinations that the ALJ made. Thank you. Thank you, Your Honor. You can take two minutes, and then your friend will have two minutes, and then we'll be done. Thank you. Going back to Your Honor's question about the code representing a complex value being transmitted on a single channel, I don't believe that specific formulation of the question was ever addressed in the record. Counsel for the Commission and for interveners, again, transmuted that into the question of whether a quote-unquote complex code can be transmitted on a single channel. Their entire definition of what they view as a complex code requires two channels. That's the whole definition. If you have two interdependent sequences on the INQ channel, according to them, you have a complex code. If you have two independent codes or only one channel being used, by their definition, you have a real code. There is no reason you cannot take a sequence of zeros and ones being transmitted on the I channel and pair them together to represent a complex number or represent a real number. The claim construction in this case is a sequence of chips representing a real value. It is not real code. It is not non-complex code. It is not independent code. It is not interdependent code. It is a sequence of chips representing a real value. In the 958 patent, a code is a sequence of chips. In Interviewer's Products, the codes are sequences of chips. They are also sequences of chips representing real values. The distinction that they are trying to draw in this case has no meaning in the field of digital signal processing. Going back very briefly to the 182 patent, as we said in our brief, another cardinal sin that the commission committed here was requiring in-hoc verba or word-for-word disclosure of the claim terms in the 182 patent. The 182 patent doesn't lay out word-for-word how to do CCK modulation, but as we've shown in our brief, it discloses an extended code set by applying various operations on matrix A. The equation in the 182 patent is the very equation that Dr. Van Nee proposed for the standard because it has good autocorrelation side lobes. I think we need to call time here. Thank you, Your Honor. Thank you, Your Honor. With respect to just a couple of points and then the overall picture, one, the reference to the other investigation that LSI supposedly took a position on, that was under 337A and B. So that was a different provision where it required a showing of article coverage. So that really is an improper reference. I would like to take back. We've just got a minute and a half here. If you go back to the time period in question and look from the questions that were asked, it seems you find it incredulous that we can understand InterDigital the way we did. InterDigital was decided, the second InterDigital, which is the one that you have to focus on, whereas the more compelling DICTA, was decided on January 10, 2013. January 10, 2013. In July and August and September, three different proceedings in the ITC investigations had hearings. We were one of them. We were the 837. There was the 841 and the 853. In every one of those investigations, there was a licensing argument, the same as we have, and in every case, after InterDigital, the ALJ and the parties applied the standards that we understood to be. No requirement of covered article. This group over here never raised the issue. They never argued it. They never said the standard had changed. They never said the law had changed. We all understood it to be as it was for 20 years. There was this language, but we also know that the holding of InterDigital was very clear. The holding was, and there was an opportunity to reverse it, the holding was that a licensing entity that didn't show an article cover on domestic industry. Can I ask you about, because your time is running out, is two questions, one on each on domestic industry and one on 867. Is it correct that redundancy would follow if accused products counted for purposes of the domestic industry requirement? I don't know that redundancy would follow. Our argument hasn't been on that ground. Our argument is that the law changed and we should be able to proceed under the old standard. But under the new standard... And on the 867, why should it not be for later forums, tribunals in particular, district courts, if the ALJ's decision on the 867 is submitted for evidentiary use, though not preclusive of use, why should it not be for the tribunal receiving that to decide what effect should be given by virtue of the fact that it was rendered unreviewable by the full commission as a result of lewdness? Just a matter of fairness, there wasn't an opportunity in this proceeding to actually challenge it here, and so it basically is an incomplete decision in that sense. It wasn't full and fair opportunity to litigate, yet it still could be used in a precedential way, potentially. Not precedential, but a persuasive way when we didn't get to finish the story. The statement was made you had an opportunity to litigate. Well, we really didn't get to litigate because it was cut off. The patent expired and there wasn't an opportunity to play it out. And so the idea that, well, you had an opportunity to litigate and this is the result you got the first time, that's not true. And it's going to take an awful lot of explaining next time around to another court to understand that, well, we didn't have a chance to fully litigate. It wasn't fully complete. The proper result should be as it is just there. Just vacate and put us back to ground zero where we started. Thank you very much. Thank you. That case is submitted.